THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CORNELL MILLER, Appellant.

First Department, June 10, 1976

*Joel S. Ezra* for appellant.

*David Spokony* of counsel *(Mario Merola, District Attorney),* for respondent.

SILVERMAN, J. Defendant appeals from a judgment convicting him after a jury verdict of criminal possession of a dangerous drug in the third degree and possession of a weapon as a felony.

Defendant contends that the court below erred in (a) denying his motion to suppress physical evidence—the gun and the narcotics; (b) not granting in full defendant's motion to limit cross-examination of defendant as to previous crimes; and (c) in denying the motion to dismiss the indictment on the ground of double jeopardy.

With respect to the suppression motion the evidence showed that two police officers, Kelly and Iacovone, on May 20, 1972 at about 10:20 P.M. while on radio patrol drove past a parked car around which several people were congregating near the intersection of Hoe Avenue and Bruckner Blvd. in The Bronx. Officer Kelly testified that he decided to approach the car for a routine check of the driver's license and the car's registration. Accordingly Officer Kelly backed up his car alongside the parked car; Officer Kelly approached the passenger's side of the parked car while his partner walked over to the driver's side to ask the driver for the driver's license and registration. Before Officer Iacovone got there, the codefendant Rudasill who was in the driver's seat had gotten out of the car.

Meanwhile, Officer Kelly shined his flashlight through the front window on the passenger's side of the car and there observed a black automatic pistol on the front seat a few inches from where appellant was sitting in the passenger's seat. Officer Kelly then ordered defendant-appellant out of the car and as defendant-appellant got out, Officer Kelly observed something more or less under the defendant-appellant's legs. When Officer Kelly looked further he found that the something was two open boxes containing 466 glassine envelopes of heroin. Appellant contends that these circumstances constitute an unreasonable search and seizure and, therefore, the gun and narcotics should have been suppressed and the indictment dismissed.

We are of course concerned with the situation only up to the moment when Officer Kelly saw the gun; after that he obviously had probable cause to believe that a crime had been and was being committed and, thus had the right to arrest the occupants of the car and to conduct a search incident thereto.

As in any case involving a claim of unlawful search or seizure the "threshold question is whether, on the facts of this case, there has been a search or a seizure." (People v Cantor, 36 NY2d 106, 110.) "Whenever a street encounter amounts to a seizure it must pass constitutional muster" (id., p 112). But did this amount to a seizure? Was there here a "stop" which falls within the definition of seizure (Id., p 112), or a search of the kind to which the search and seizure provisions of the Fourth Amendment to the United States Constitution apply?

In the case at bar appellant's car was parked; it was not stopped or blocked by the police nor was there any indication it was about to move. Neither the codefendant nor appellant was told to freeze or not to move or to move. All that happened was that the police officers approached the car without guns in their hands, and the codefendant got out of the car. Furthermore, specifically with respect to the appellant, he was seated in the passenger's seat in a car that was parked and he apparently had a can of beer in his hand. Nobody touched him; nobody said anything to him; nobody asked him to move or not to move; he was not attempting to move; he was just sitting in the car and continued to do so until after the police officer had seen the pistol. It is difficult to see how any of this constituted a stop or seizure of appellant.

Appellant relies of course on People v Cantor (36 NY2d

106). But there it appears that the police officers in an unmarked car followed the defendant's car for some distance, then when the defendant pulled to the curb in front of his home, the unmarked police car stopped behind the defendant's car. Two of the officers got out and approached the defendant, while the third officer drove his car ahead of the defendant's car so as to block it from moving forward. Defendant reached into his back pocket and removed what one of the officers believed to be a pistol and pointed it at the officers whereupon one of the officers took his badge from his pocket, drew his revolver and identified himself as a policeman; the defendant was told to freeze and place his hands over his head, which he did. The Court of Appeals held that the defendant was deprived of his freedom of movement when he was encircled by three police officers as he stood alongside his car which was blocked by the police vehicle and that this constituted a seizure within the meaning of the Fourth Amendment.

Again in *People v Allende* (39 NY2d 474), the police officers, with guns drawn, approached a double-parked car whose engine was running. The Court of Appeals held this to be a seizure.

These situations appear to me to be very far from the present situation where appellant was neither prevented from doing anything he wanted to do nor directed to do anything nor was his car stopped or blocked by the police until after the police officer had seen the gun. Thus I think there was no "seizure."

Was there a search? As I have said, the police officer did not reach into the car, did not open a door or window, did not lay his hand on the car or on the door until he saw the gun; he merely flashed a light through the window of the car and then saw the gun.

Of course it is an elementary physical fact that all objects which are not themselves a source of light are seen because a light shines on them and is reflected from them. If this incident had happened in the daytime and the officer had seen the gun by daylight it could not be argued that this was a search, or if the officer saw the gun by the reflected light of a street light, or the headlights of a passing car, this would not constitute a search. What the officer did when he shone his flashlight into the car was to furnish the light which would otherwise have come from daylight, street light or the lights of a passing car. While a flashlight held in the hands of a

police officer and purposely shined upon someone is doubtless more annoying and in that sense intrusive than indiscriminate daylight, street lights or passing headlights, I do not think this should be held to constitute a search within the meaning of the Fourth Amendment.

It is certainly a well recognized, proper procedure for a policeman to shine lights into dark or shadowed places, dark hallways, closed stores, areaways and under stairs and stoops, trees and bushes.

In *People v Cruz* (34 NY2d 362, 370) involving a traffic stop under what the court referred to as suspicious circumstances during which the police officer shined his light about the interior of the car, the Court of Appeals said, "Shining the flashlight about the interior of the car was not an unreasonable intrusion". (Accord *People v Howell,* 78 Misc 2d 538, 540, affd 51 AD2d 1105.)

If, however, this police activity is deemed a search or seizure within the Fourth Amendment, it is certainly minimal and this fact must be balanced against the need in order to arrive at a judgment as to reasonableness. As the Supreme Court has said, even where there is a search and seizure "[t]he manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all." *(Terry v Ohio,* 392 US 1, 28.) In that case the Supreme Court defined as "the central inquiry under the Fourth Amendment—the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *(Id.,* at p 19.) The court further said (p 21): "there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' " The same balancing test has been recognized and adopted by our State Court of Appeals. "Whether or not a particular search or seizure is to be considered reasonable requires weighing the government's interest in the detection and apprehension of criminals against the encroachment involved with respect to an individual's right to privacy and personal security". *(People v Cantor,* 36 NY2d 106, 111, *supra.)*

"Depending upon the extent of intrusion upon a person's privacy, corresponding levels of cause and justification are required. * * * The greater the intrusion into the privacy or the restriction of the freedom of the person the greater the justification required." *(People v Perel,* 34 NY2d 462, 465.)

This principle has recently again been recognized and applied by the Court of Appeals in *People v Doerbecker* (39 NY2d 448, 452): "Also relevant was the relatively limited extent of the intrusion on the privacy when measured against the justification which existed for it."

Here the police activity was justified by the well understood duty of a police officer both to be alert and to be prudent. In *People v Rivera* (14 NY2d 441, 444-445, cert den 379 US 978) the Court of Appeals said: "Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime function of city police to be alert to things going wrong in the streets; if they were to be denied the right of such summary inquiry, a normal power and a necessary duty would be closed off." Here the police officers did see some unusual activity not necessarily criminal. In the exercise of their duty to be alert they proceeded to make inquiry. (The presence, as it later turned out, of the boxes containing hundreds of glassine envelopes of heroin suggests both a possible reason why so many people were congregated around this car, and a justification for police alertness and inquiry about such congregation.)

Conscious of the dangers of approaching an unknown automobile, the police officers were prudent. They kept their eyes open. They looked. Officer Kelly testified, "Q. Why did you shine your light into the car? A. To caution, make sure to protect my partner's life and to protect my life, to make sure no one was holding a gun, nothing was there that could jeopardize our lives. * * * Q. Were you afraid of your life when you went over to that car, officer? A. I always fear a little when I make a car stop for my life."

I do not feel justified from the safety of my judicial chambers in saying that the police officer was wrong or acted illegally when he prudently looked and watched, particularly when the proof of the pudding turned out to be a loaded pistol on the seat within inches of the appellant's hand.

The police officers in this case, in explaining their action, used the unfortunate phrase "routine traffic check" as the reason for their approach.

In *People v Ingle* (36 NY2d 413, 415) decided three years after the incident here involved, the Court of Appeals held that a "routine traffic check" is permissible only when conducted according to nonarbitrary, nondiscriminatory uniform procedures for detecting violations of the Vehicle and Traffic

Law. The court pointed out (p 415) that "in the context of a motor vehicle inspection 'stop', the degree of suspicion required to justify the stop is minimal." *People v Simone* (39 NY2d 818) makes clear that the rule of the *Ingle* case applies to a routine traffic check that took place even before *Ingle* was decided.

However, I think *People v Ingle* did not hold that all evidence obtained in the course of a routine traffic check which did not comply with the requirements set forth in *People v Ingle* was thereby rendered suppressible. All that *People v Ingle* held was that what would otherwise constitute an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution was not validated because made in the course of a "routine traffic check" that did not comply with the requirements set forth in *People v Ingle.*

But before the evidence can be suppressed there must still be shown to have been an otherwise unreasonable search or seizure. Thus in the *Ingle* case the police officer stopped an automobile arbitrarily chosen from the stream of traffic. The automobile was moving on the highway, the police officer switched on his red signal lights and flasher and caused defendant to pull over to the side of the road (36 NY2d, at pp 414, 415). In the most literal sense, the defendant and his car were stopped by the police. Again in the *Simone* case, defendant's car was stopped by the police officer. (See *People v Simone,* 48 AD2d 497, 498.)

In the present case as I have indicated, I do not think there was a search or seizure before the police saw the gun.

Further, as the Court of Appeals said in *People v Ingle* (36 NY2d 413, 420, *supra)* even where there is a stop, it "should be emphasized that the factual basis required to support a stop for a 'routine traffic check' is minimal. * * * All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity." In the present case the police officer's action was not a product of "mere whim, caprice or idle curiosity." The police saw an unusual activity in the street, and in the course of their duty to be alert to unusual activity, they approached to inquire.

In the circumstances I think the motion to suppress was properly denied.

Appellant also contends that he was subject to double jeopardy because the court granted his codefendant's motion

for a mistrial on an earlier trial after the jury had been selected but before any evidence was taken. The reason for the mistrial was that the codefendant's attorney stated that he could not represent the codefendant because the codefendant had told him that he was going to testify and perjure himself. It is clear that appellant's attorney acquiesced to the mistrial as to both defendants. It is further clear that the mistrial even as to appellant was to serve the ends of public justice and a matter of manifest necessity. (Cf. *United States v Perez*, 9 Wheat. [22 US] 579.) Having been informed that the codefendant intended to perjure himself, the first Trial Judge felt that he might be unable to be impartial with respect to appellant who after all was in the car with the codefendant, and therefore in the interest of justice—to assure both defendants of an impartial Judge—he ordered a mistrial as to both defendants on the motion of the codefendant and with the acquiescence of appellant's attorney. A new trial after a mistrial so ordered is not a violation of defendant's right not to "be subject for the same offence to be twice put in jeopardy." (US Const, 5th Amdt.)

The remaining errors claimed do not require discussion.

The judgment appealed from should be affirmed.

MARKEWICH, J. P., LUPIANO, NUNEZ and YESAWICH, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on December 6, 1974, unanimously affirmed.