OPINION OF THE COURT
Alan Broomer, J.
Defendant has moved to suppress a loaded gun recovered from a small nylon bag he was carrying. The facts that *263 emerged after a hearing are deceptively simple and not in dispute. It is the absence of law on point that prompts this opinion. The question raised is whether a police "search” can be so minimally invasive as not to trigger Fourth Amendment protections. Under the facts of this case, the answer is yes.
THE FACTS
On August 25, 1987, at 8:15 p.m., Police Officer Roland Kloepfer, in civilian clothes and driving an unmarked department car, responded to a radio dispatch of "past assault, man with a gun” at Rockaway Avenue and Fulton Street, Kings County. He saw a group of five men standing on a corner; one of the men fit the description broadcast. As Kloepfer approached on foot, 1 of the 5 (not the one described) backed into him. The man was carrying a small nylon bag which "bumped” the officer’s hand. It felt like a hard object but the officer had no idea what it might have been from the brief initial contact. He turned his hand and squeezed the bag; it felt like a gun. He placed the man against a wall, opened the bag and recovered a loaded gun, the subject of this motion to suppress. I take judicial notice of the fact that the above intersection at 8:15 p.m. of a summer evening is a crowded location.
FOURTH AMENDMENT JURISPRUDENCE
To Justice Brandeis, the Fourth Amendment embodied the right to be let alone (Olmstead v United States, 277 US 438, 478 [Brandeis, J., dissenting]).
However, the right was not absolute since only "unreasonable searches and seizures” were forbidden by the Fourth Amendment. When an arrest is made on the basis of probable cause, the search incident thereto is reasonable. The police may "frisk” an individual for weapons where the officer reasonably concludes that "criminal activity is afoot” and the suspect he has stopped to question may be armed and presently dangerous (Terry v Ohio, 392 US 1). This detentive stop and inquiry and resultant authority to frisk for weapons has opened a new and developing area of the law (Terry v Ohio, supra, at 31 [Harlan, J., concurring]).
Street encounters between police and suspects are dangerous and often involve rapidly unfolding scenarios. To the participants they are all of a piece. However, Judges in their calm reflections have bifurcated their analyses into two sepa *264 rate but interrelated inquiries, namely, the facts and circumstances of: (1) the investigative stop, and (2) the resultant search or frisk.
Before we focus on the search herein, some background is needed.
In a free society, there is a continuing tension between the rights of people to be let alone by government and police activity directed at public service to the community-at-large, general peace-keeping responsibilities and enforcement of the criminal law. The interface created by these competing goals has been characterized as a "sensitive area” (Terry v Ohio, supra, at 9). Street encounters between the police and civilians undoubtedly outnumber all other contacts and generate most of the business of our criminal courts. Such contacts run the social gamut and include friendly exchanges, transmittals of useful information to the authorities and sometimes extremely violent and dangerous confrontations with armed and vicious criminals. The cases spawned by such encounters are beyond the judicial comprehension of the moment and are said to be of "protean variety” (Terry v Ohio, supra, at 15). They are the grist for Fourth Amendment jurisprudence.
The Fourth Amendment now covers " 'people, not places’ ” and extends its protection wherever an individual may harbor a " 'reasonable’ * * * expectation of privacy” (Katz v United States, 389 US 347, 361). It is the fount of most of the law governing police-civilian encounters.
It is black letter law today that whenever a police officer encounters a person and restrains his movements, he has "seized” that person. When the officer runs his hands up and down a person’s outer clothing looking for weapons, he has "searched” that person (Terry v Ohio, supra, at 16). When an officer frisks a person in public, he subjects him to an indignity, he invades his person, he may arouse strong resentments that may boil over into the community and where an arrest follows, invites judicial application of Fourth Amendment principles.
An evolving Fourth Amendment jurisprudence eschews absolutes and seeks factors to balance the interests involved (Camara v Municipal Ct., 387 US 523, 534-537). Police behavior that constitutes an invasion of privacy must be weighed by balancing the intrusion against Fourth Amendment protected interests (Delaware v Prouse, 440 US 648, 654). The public’s interest in a safe system of transportation outweighs a train *265 motorman’s privacy interest in his urine or blood. Where trains crash, involved railroad workers are now subject to mandatory tests for drugs and alcohol, even where the individual employee was not previously suspected of such use (Skinner v Railway Labor Executives’ Assn., 489 US —, 103 L Ed 2d 639). Closer to home, "[C]oncealed weapons present an immediate and real danger to the public. * * * that danger * * * should support an appropriate police response on less than a probability” (People v Moore, 32 NY2d 67, 72).
Fourth Amendment jurisprudence must take into account that these confrontations frequently involve rapidly developing situations where officers and those they encounter react to each other in increasingly heated, emotional and often violent ways. The manner in which the police conduct themselves is always crucial. An approach, reasonable at first, may become constitutionally offensive if it is not kept civilized and appropriately intensive in scope to the developing scenario. Should the other side up the fright ante, the police can respond in kind.
The overriding consideration is always reasonableness. The officer must have an objectively verifiable basis for his actions. Guesses, hunches, even the good faith of the officer are insufficient to invade Fourth Amendment rights (Beck v Ohio, 379 US 89, 96, 97).
Occasionally people are stopped by the police and searched for no articulable reason. The officer had a hunch, or "he didn’t look right”, or "I thought he might be dirty”, are the "reasons” advanced for the stops. Whimsical or arbitrary stops are particularly disturbing to the courts; the concern is that they are motivated by something sinister. Recently the Court of Appeals held that border searches, hitherto an exception to the usual search and seizure rules, had to be based on some level of suspicion (People v Luna, 73 NY2d 173). What undoubtedly troubled the court was the fact that certain people were being singled out for special attention by the authorities. Arbitrariness and whimsicality are not present in the subject case, further tipping the balance in favor of receipt of the evidence.
Clearly, intrusions on less than probable cause are permitted to assure that the officer is not in danger of being shot or stabbed by the person he has stopped. Still, however, what he does in that regard is scrutinized carefully to insure that he doesn’t overreach, that what he does is reasonably related in *266 scope and intensity to what he encounters (Warden v Hayden, 387 US 294, 310). A quantitative as well as a qualitative gauge must be employed.
People v De Bour (40 NY2d 210) is at the cutting edge of jurisprudence in this area. There, New York’s Court of Appeals found proper De Bour’s stop for barely adequate reasons, i.e., he crossed the street at the approach of two uniformed police officers. What undoubtedly influenced the court was the total absence of rude and aggressive behavior by the officers. Their inquiry was limited in time and scope. It was devoid of harassment or intimidation and it did not subject him to any loss of dignity. In short the officers were nice to him. The lesson for the police is a variant of the old saw of catching more flies with honey than with vinegar.
Implicit in all Fourth Amendment jurisprudence is the operation of the exclusionary rule. The rule is applied for its deterrent effect on future police behavior. The police are on notice that where they seize evidence in violation of constitutional rights, they will be deprived of its use in court and the criminal will go free. Operation of the rule rests on the assumption that " 'limitations upon the fruit to be gathered tend to limit the quest itself ” (Terry v Ohio, 392 US 1, 29, supra, citing United States v Poller, 43 F2d 911, 914).
DISCUSSION
The case at hand exemplifies the "protean variety” of police-citizen encounters. Neither counsel nor I have found any law reasonably in point. Peculiarly the facts herein constitute a search absent any kind of antecedent inquiry or seizure of the person. The defendant’s backing into the officer was entirely unexpected and fortuitous. As such it lacked any of the usual tension inducing factors attendant upon police-civilian encounters. The collision of the two bodies is entirely lacking in constitutional significance.
The focus of our analysis is the squeezing of the bag after it made hard contact with the officer’s hand. Almost reflexively he turned his hand to bring a more informing part (his fingers) of that organ into contact with the hard object, revealing its nature as a gun. I find that act, substantively, little different from what occurred in People v Robinson (115 AD2d 411). Robinson had been properly stopped for traffic infractions and strong suspicions that he was driving while intoxicated. Upon inquiry he had no insurance card, a torn, *267 temporary out-of-State license and an unsigned registration in someone else’s name. He was ordered out of his van so that the inquiry could continue. After he moved away from the door, the officer looked into the van, using a flashlight to reveal what was not obvious to his naked eye, a gun. The Appellate Division held (supra, at 413) that since the initial stop and detention were valid, "shining a flashlight into the interior of the van to illuminate what would have been in plain view in daylight did not involve an unreasonable intrusion.” (See also, United States v Lee, 274 US 559, 563; People v Cruz, 34 NY2d 362; People v Hill, 148 AD2d 546.)
In both cases what was done merely enhanced a sensory perception, in Robinson (supra) the sense of sight, in our case, the sense of touch. In neither case did the enhancing involve more than a barely discernible elevation of the initial unexceptional contact.
In another case, three officers stopped to arrest a fugitive on a dark, deserted street at 2:00 a.m. During the arrest, a stranger came out of a nearby building, looked at the officers, uttered an expletive, turned and sought to reenter the building, but was thwarted by the door which had locked behind him. The officers, one with drawn gun, requested him to turn around. When he finally turned, the officers saw a handgun in his waistband. The Appellate Term, affirming denial of suppression below, relied upon De Bour principles. They found that under the circumstances it was reasonable for the officers to make the simple request of the defendant to turn around. They found significant that the encounter did not subject the defendant to a loss of dignity nor were the police acting whimsically (People v Natoli, 109 Misc 2d 49).
There was no evidence before me that our defendant was even aware of the slight additional contact occasioned by the squeeze and I conclude that he was not. Thus, he was spared the experience of an invasively humiliating police search on a public street. As such, there was a complete absence of those intrusive factors usually attendant upon street searches.
An important question is whether the defendant possessed a reasonable expectation of privacy in the contents of his nylon bag at that time and place. What is a reasonable expectation, however, varies with locale. In that staid, quiet civilized atmosphere of the 42nd Street library, people respect each other’s space completely. How different it is in a crowded subway car during rush hours, where the only expectation of *268 privacy one can reasonably entertain is in the integrity of one’s own bloodstream. I find the robust, hurly-burly of Rockaway Avenue and Fulton Street at 8:15 p.m. more akin to the aforementioned subway car during rush hour than the cloistered confines of the public library. In short the reasonable expectation of privacy at that time and in that place in reference to the contours of that nylon bag was minimal. People v Crapo (103 AD2d 943, affd 65 NY2d 663) is instructive. There the Appellate Division affirmed a decision below where the court refused to suppress a policeman’s observations made through the defendant’s garage window after the officer walked some 10 to 20 feet along defendant’s private driveway. The court concluded (at 943): "The officer’s action in walking up defendant’s driveway to the door of his garage and then looking through the garage door window was no more intrusive an event than ordinarily occurs during the daily incidents of live in an urban neighborhood by, e.g. a paperboy, garbage collector or door-to-door salesman. Clearly without some outward manifestation that trespasses of this nature, even upon the curtilage of his property, were forbidden, defendant had no reasonable expectation of privacy that was infringed by the arresting officer”.
Lacking an intrusion upon a legitimate expectation of privacy, there is simply no search violative of the Fourth Amendment (Illinois v Andreas, 463 US 765, 771).
Since, the contact between our defendant and the police officer was in no respect engineered or contrived by the officer but largely the result of happenstance, the application of the exclusionary rule would have no deterrent effect on future police behavior in kind and therefore should not operate to suppress the gun seized. Also, absent contrivance by the officer, the aggravating influence of whimsicality is just not present.
CONCLUSION
The action of the defendant causing his nylon bag containing a gun to bump the officer’s hand was without constitutional significance. It certainly was not a seizure of his person. That body of law applicable to seizures is entirely inapposite. The feeling of the bag, this time with the intelligent part of the hand (the fingers), constituted a "search” for which there was neither probable cause nor a reasonable perception of danger warranting a protective frisk. However, the act of *269 substituting the fingers for another part of the hand already accidentally in contact with the bag is so minimally intrusive, so lacking in all those exacerbating interpersonal factors that attend street encounters as to be of subconstitutional significance.
Since the closing of the officer’s fingers on the bag was more in the nature of a reflex than an intentional act, there is no warrant to apply the exclusionary rule and I decline to do so. Moreover, absent a legitimate expectation of privacy, this was not a search in Fourth Amendment terms (Illinois v Andreas, supra). Once the officer felt the object and believed it was a gun, he had probable cause to arrest and search the defendant. The motion to suppress is denied.